# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PEGGY MISCH**
        **Plaintiff,**

    **v.**                              **Case No. 16-C-687**

**NANCY A. BERRYHILL,[1]**
**Acting Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Peggy Misch seeks judicial review of the decision of an administrative law judge ("ALJ") denying her application for social security disability benefits. <u>See</u> 42 U.S.C. § 405(g). The court "will uphold an ALJ's decision if it is supported by substantial evidence, but that standard is not satisfied unless the ALJ has adequately supported his conclusions." <u>Meuser v. Colvin</u>, 838 F.3d 905, 910 (7th Cir. 2016). Because the ALJ did not do so here, I reverse and remand for further proceedings.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff filed the instant application on June 11, 2012, alleging disability due to back, hip and leg pain, depression, and anxiety, with an onset date of November 7, 2011 (Tr. at 286, 345, 349), although she indicated that she stopped working in April 2009 because of her

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Nancy Berryhill is substituted as defendant for Carolyn Colvin.

conditions.[2]  (Tr. at 349.)  In a function report, plaintiff alleged constant pain, for which she took

Vicodin.  (Tr. at 356.)  She indicated that she could not sit or stand for long and had a hard time

dressing and bathing.  (Tr. at 357.)  She prepared easy meals, and her husband did the

cleaning and yard work.  (Tr. at 358.)  In a physical activities addendum, plaintiff indicated that

she could sit for one hour, stand for 20 minutes, and walk for 10 or 15 minutes.  Her doctor

limited her lifting to 10 pounds.  (Tr. at 364.)

## B.    Medical Evidence

On October 1, 2010, plaintiff saw Dr. Merle Rust, a neurosurgeon, regarding her

complaints low back, hip, and left knee pain.  Plaintiff reported that she had injured herself in

June 2007 while bending over to pick something up; she felt a stabbing sensation in her back

and soon developed anterior groin/left hip discomfort.  She underwent extensive physical

therapy and ended up having surgery.  A September 7, 2010, MRI showed mild, multi-level

degenerative disc change, as well as a small protrusion on the left side at L4-5.  (Tr. at 471,

494-95.)  She reported that she had stopped working due to pain.  (Tr. at 471.)  She took

Vicodin sparingly for pain.  On physical exam, she stood 5'4" and weighed 180 pounds.

Straight leg raising was negative; hip rotation showed very mild restriction with some discomfort

on external rotation on the left side; palpation of the back suggested mild tenderness in the

paraspinal facet area with no obvious spasm; and gait was unremarkable.  Neurologically, she

showed full strength in hip flexion, knee extension and flexion.  Dr. Rust suggested a left lower

––––––––––––––––––––––

[2]Plaintiff filed a previous application in July 2009, which was denied by an ALJ on October 28, 2011.  (Tr. at 120.)  In her disability report accompanying the instant application, plaintiff acknowledged that the earliest possible onset date was October 29, 2011, the day after the ALJ's decision on the previous application.  (Tr. at 345.)  The chosen onset date, November 7, 2011, was the day plaintiff underwent hip replacement surgery.  (Tr. at 393.)

extremity EMG; he did not recommend immediate surgery.[3]  (Tr. at 472.)

On January 24, 2011, plaintiff saw Dr. Rachel Gronau to establish primary care.  She reported an ongoing history of low back and joint pain, including in her knees and ankles.  Her back had gotten worse over the past year, and she had been unable to work for two years.  She took Vicodin as needed.  She reported gaining about 40 pounds in the past year and a half due to inactivity related to pain, up from her usual 145.  (Tr. at 475.)  Dr. Gronau assessed chronic back pain, continuing Vicodin as needed.  They also discussed weight loss strategies, including use of phentermine.[4]  (Tr. at 476.)

On February 18, 2011, plaintiff returned to Dr. Gronau, taking phentermine without side effects and having lost four pounds.  She had not been able to do much exercise as her back flared after shoveling.  Dr. Gronau recommended continued weight loss, which would help with her back and joint pains.  She also recommended a walking or cycling program, or swimming.  (Tr. at 479.)

On March 21, 2011, plaintiff noted phentermine was not as effective the past two weeks.  She did report more energy and feeling better overall, having lost another three pounds.  She was trying to exercise but still had problems with chronic back pain and was limited in how much she could do.  Dr. Gronau increased phentermine.  (Tr. at 482.)

On April 19, 2011, plaintiff again advised Dr. Gronau that she felt better overall with further weight loss.  She had started a walking program but could not walk more than 15

---

[3]On October 19, 2010, Dr. Rust completed a medical source statement, in which he declined to opine on plaintiff's functional capacity.  (Tr. at 500-04.)

[4]Phentermine is a stimulant which acts as an appetite suppressant.  It is used together with diet and exercise to treat obesity in people with risk factors such as high blood pressure, high cholesterol, or diabetes.  https://www.drugs.com/phentermine.html.

minutes at a time due to her back and leg pain. (Tr. at 485.)

On April 27, 2011, Dr. Bradley Fideler prepared a lumbar spine medical source statement, listing diagnoses of multiple level degenerative disc disease and spinal stenosis, with a poor prognosis.[5] As clinical findings, he cited the MRI showing degenerative disc disease, and he listed symptoms of pain, weakness, and inability to bend, twist, and lift. He indicated that plaintiff experienced chronic, severe pain, worse with activity, requiring use of narcotic pain medications. (Tr. at 513.) As positive objective signs, he checked reduced range of motion (limited bending/twisting), muscle spasm, abnormal gait, muscle atrophy, muscle weakness, impaired appetite, tenderness, and impaired sleep. Her medications caused side effects of dizziness, drowsiness, and nausea. She could continuously walk less than one block, sit for one hour, and stand for one hour; in an eight-hour workday, she could sit less than two hours and stand/walk less than two hours. She also required a job that permitted shifting positions at will. (Tr. at 514.) She had to get up and walk around every 60 minutes for 10 minutes. She also needed two to three unscheduled breaks of 10 minutes duration during a working day, as well as the use of a cane or assistive device while engaged in standing/walking. She could occasionally lift 10 pounds, never more; rarely twist, stoop, crouch, and climb stairs; and never climb ladders. Dr. Fideler assessed no limitations with reaching, handling, and fingering, other than the weight lifting limit. (Tr. at 515.) She would

---

[5]The records indicate that plaintiff saw Dr. Fideler, an orthopedist, in February 2008 for evaluation of her back pain. At that time, Dr. Fideler recommended therapy, medications, and activity restriction, with surgery as a final alternative. (Tr. at 455.) Plaintiff returned to Dr. Fideler on January 18, 2010, reporting pain, swelling, and locking in her left knee. Dr. Fideler suspected a possible meniscus tear, scheduling an MRI. (Tr. at 460.) The MRI looked good, with no meniscus tears or significant degenerative changes, and Dr. Fideler recommended conservative treatment options at that time. (Tr. at 461, 492.)

likely be off task about 20% of a typical workday due to symptom interference with attention and concentration. She would likely experience good days and bad days, and miss about four days per month as a result of her impairments or treatment. These limitations applied for the past two to three years. (Tr. at 516.)[6]

On May 23, 2011, plaintiff returned to Dr. Gronau, continuing to take phentermine without side effects, reporting more energy and feeling better overall. She was on a walking program but was not able to walk more than 15 minutes due to her back and leg pain. (Tr. at 554.) Dr. Gronau increased phentermine. (Tr. at 555.) On July 20, plaintiff reported trying to increase her activity level, walking her dog and doing yard work. The yard work did flare her back up, and she requested a refill of Vicodin. (Tr. at 556.) On August 22, plaintiff reported doing well on her walking program except for the last two weeks. She felt ready to stop phentermine. (Tr. at 557.) She weighed 167 pounds that day. (Tr. at 558.)

On September 27, 2011, plaintiff presented to Dr. Gronau for follow-up of her low back and left hip pain, which had recently been getting worse. She requested referral to neurosurgery. (Tr. at 559.) She was to see Dr. Craig Lyon in consultation of her hip pain, obtain a repeat MRI, then seek follow-up with neurosurgery. (Tr. at 560.)

On October 10, 2011, plaintiff saw Dr. Lyon for evaluation of her left hip, which had been bothering her for several years. In 2008, she had a labral tear. In 2009, she had a left hip scope done for presumed impingement. The hip never significantly improved and had been

---

[6]According to a May 11, 2011, discharge note, plaintiff participated in physical therapy for her left hip from April 22, 2009, to July 22, 2009. Initially, she made progress but then developed significant back pain, which limited her ambulation, sitting tolerance, and ability to lift objects. Therapy was discontinued due to lack of progress, and she was referred to an orthopedic spine specialist. (Tr. at 518.)

worsening over the past year requiring use of Vicodin for pain control. She had difficulty rotating the hip, walking for long distances, and going up and down stairs. (Tr. at 520.) Dr. Lyon recommended total hip arthroplasty. (Tr. at 521.)

Dr. Lyon performed the hip replacement surgery on November 7, 2011. (Tr. at 522.) Plaintiff's post-operative course was uncomplicated. She tolerated physical therapy extremely well and was tolerating oral medications on the evening of surgery. She had a very high pain tolerance and was discharged home on Percocet only on November 9 and would continue home physical therapy. (Tr. at 524.) According to a November 22 follow-up note, plaintiff was onto the cane, weaning herself off the Percocet onto Vicodin. She was going to start out-patient physical therapy. (Tr. at 526.)

On November 28, 2011, plaintiff underwent a physical therapy evaluation, reporting functional limitations with walking, car transfers, sitting in a car, putting on sock/shoes, and stairs. (Tr. at 526-27.) She was ambulating but lacked hip flexibility and strength for functional mobility. (Tr. at 529-30.) She was to be seen once per week for six weeks. (Tr. at 530.) On December 6, plaintiff demonstrated increased left hip extension tolerance for gait phase. She had minimal pain complaints. She did lack hip strength and tended to deviate without use of an assistive device. (Tr. at 531.) On December 13, she was walking without an assistive device and had minimal trunk compensation. She did complain her whole body was aching that day. (Tr. at 532.) On December 27, she was ambulating with minimal deviation. She did have mild-moderate hip flexor tightness and continued lateral hip weakness. (Tr. at 533.) Plaintiff also saw Dr. Lyon that day, reporting the pain in the hip was much better than before surgery. She felt her strength was still improving. She was very pleased with the results thus far. (Tr. at 534.)

On February 15, 2012, plaintiff returned to Dr. Lyon, "doing great with the hip." (Tr. at 534.) She did report intermittent bouts of radicular-type symptoms with the lower back radiating around to the back of the leg. She had been taking Vicodin for pain control, which was not working as well as in the past. (Tr. at 534.) Dr. Lyon ordered a repeat MRI of the lumbar spine, started her on Medrol Dosepak,[7] and referred her to Dr. Rust for further evaluation. (Tr. at 535.)

On March 2, 2012, plaintiff saw Dr. Rust, reporting great benefit from the left hip replacement with resolution of her deep groin, generalized hip, and thigh pain. However, she still had residual low back pain issues. In 2010, Dr. Rust appreciated a small disc bulge on the left side at L4-5, but EMG results were negative, so he refrained from recommending any surgery. A repeat MRI continued to show a small disc bulge, with no other new process or area of nerve root impingement. (Tr. at 519, 548-49.) Her exam again showed no focal weakness with knee extension, dorsiflexion, and plantar flexion demonstrating 5/5 strength bilaterally. Based on the unchanged appearance of the new MRI, Dr. Rust recommended conservative measures, including an epidural steroid injection. (Tr. at 519.)

On March 2, 2012, plaintiff saw Dr. Gronau with concerns regarding weight gain. She had been doing well managing her weight until winter. She had hip replacement surgery and since then had been having more issues with her back pain, which restricted her activity level. She wanted to go back on phentermine, which Dr. Gronau provided. (Tr. at 632.) On March 30, plaintiff advised that she was scheduled at a local pain clinic to try some injections and possibly a facet block to help manage her pain. Dr. Gronau increased phentermine. (Tr. at

---

[7]Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation. https://www.drugs.com/mtm/medrol-dosepak.html.

633.)  On May 1, plaintiff again asked to increase phentermine, indicating that it effectively reduced her appetite, but she was not losing much weight due to her inability to exercise.  She had started to walk for five minutes two to three time daily but could not go very quickly because of back pain.  (Tr. at 633.)  Her epidural injection had been canceled due to financial issues.  (Tr. at 634.)  On exam, she had normal gait, negative straight leg raise, and normal strength.  No muscle atrophy was noted.  Dr. Gronau advised plaintiff to notify Dr. Rust of her worsening back pain and perceived weakness in her left leg.  Dr. Gronau did not notice any focal weakness on exam, but plaintiff recently had a left hip replacement and ongoing back issues so she may have some generalized weakness and de-conditioning issues.  Dr. Gronau recommended a course of physical therapy.  (Tr. at 635.)

On June 7, 2012, plaintiff returned to Dr. Gronau for an annual exam.  She had not been able to go for physical therapy or see a pain specialist for injections due to her financial situation.  She also reported anxiety due to family issues.  (Tr. at 635.)  Dr. Gronau tried meloxicam for an anti-inflammatory to help with pain management.[8]  Plaintiff also requested a functional capacity exam as advised by her lawyer to pursue disability.  She was to use Vicodin sparingly as needed for severe pain.  For anxiety, Dr. Gronau recommended a low dose of fluoxetine.[9]  (Tr. at 637.)

On June 26, 2012, plaintiff saw Dr. Jilaine Bolek Berquist, a rheumatologist, for evaluation of widespread body pain.  She reported being uncomfortable if she had to sit too

---

[8]Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis. https://www.drugs.com/meloxicam.html.

[9]Fluoxetine (Proxac) is an antidepressant.  https://www.drugs.com/fluoxetine.html.

much and soreness when she had to get up; cleaning her house was quite difficult. She stated that if she lied down for too long she could not move her legs and had to sleep in a recliner. She had tried various medications, which did not help. (Tr. at 609.) On exam, she had 0 of 18 fibromyalgia tender points, but some crepitus of her knees bilaterally. Dr. Berquist assessed polyarthralgia, which she thought was a combination of multiple injuries to various joints and not due to something like fibromyalgia or inflammatory arthritis. (Tr. at 610.)

On July 2, 2012, plaintiff underwent an occupational therapy evaluation, which assessed a functional ability level of light. (Tr. at 613-21.)

On September 19, 2012, Dr. Gronau completed a residual functional capacity questionnaire, listing diagnoses of low back and left leg pain with a fair prognosis. She opined that plaintiff's pain and other symptoms would occasionally interfere with the attention and concentration needed to perform simple work tasks. (Tr. at 624.) Plaintiff could continuously sit for 30 minutes and stand for one hour; in an eight-hour day, she could sit for about two hours and stand/walk about two hours. She needed a job that allowed shifting positions at will. She could frequently lift less than 10 pounds, occasionally 10 pounds; occasionally twist, stoop, crouch, and climb ladders; and frequently rotate and extend her neck. (Tr. at 625.) She would have good and bad days, and miss one to two days per month due to her impairments or treatment. (Tr. at 626.)

On October 31, 2012, plaintiff presented to Dr. Gronau with ongoing concerns of anxiety and obsessive-compulsive behaviors. She had been on fluoxetine for several months without improvement. Dr. Gronau discontinued fluoxetine and started luvox.[10] Plaintiff declined a pain

---

[10] Luvox (fluvoxamine) is an antidepressant. https://www.drugs.com/mtm/luvox.html.

clinic referral for her back due to financial concerns. (Tr. at 627.)

On January 10, 2013, plaintiff returned to Dr. Lyon, reporting two falls in the past week, twisting her left knee both times. X-rays showed no effusion and preserved joint spaces. She ambulated with a normal heel-to-toe gait without any assistive devices. Dr. Lyon suspected a medial meniscal tear. (Tr. at 572.) He obtained an MRI to evaluate intra-articular structures. (Tr. at 573.) On January 18, Dr. Lyon noted that the MRI was consistent with patellofemoral chondromalacia. (Tr. at 573, 585.) They would try conservative treatment first, injecting the knee with cortisone. (Tr. at 573.)

Conservative treatment options failed, and on January 29, 2013, plaintiff saw Dr. Gronau for pre-operative evaluation in anticipation of a left knee arthroscopy for patellar chondromalacia. (Tr. at 574.) On February 8, Dr. Lyon performed the surgery. (Tr. at 579-80.) On February 22, plaintiff reported doing well; the pain was improving, swelling going down, and motion coming back. (Tr. at 677.)

On March 5, 2013, plaintiff presented to Dr. Gronau to discuss weight loss, wanting to get back on phentermine. Her knee and back pain had worsened as her weight increased. She was trying to wean off luvox, feeling her anxiety was well-controlled. (Tr. at 657.) Dr. Gronau started phentermine and continued to wean off luvox. (Tr. at 658.)

On March 22, 2013, plaintiff returned to Dr. Lyon, reporting that she stepped awkwardly the other day and felt posterior buttock pain. (Tr. at 677.) On exam, she ambulated with a normal heel-to-toe gait without any assistive devices. Dr. Lyon assessed abductor and low back strain, providing a referral to a neurosurgeon and recommending conservative management for the strain. (Tr. at 678.)

On April 2, 2013, plaintiff saw Dr. Gronau for follow up of her weight loss efforts. (Tr.

10

at 655.)  She had lost four pounds that month and was doing well with her exercise regimen, walking 10 to 15 minutes per day.  (Tr. at 656.)

On May 8, 2013, plaintiff returned to see Dr. Rust following a more recent MRI dated April 23, 2013, which continued to show a small foraminal bulge on the left side at L4-5.  (Tr. at 652, 752-53.)  It did not appear to cause significant nerve root compression.  The remainder of the MRI was unchanged from the previous scan with no significant central or lateral recess impingement.  Plaintiff had undergone a hip replacement and knee surgery, which helped her. She had no really well-defined radiating leg pain at that time.  She complained of low back pain, which was aggravated by lying flat and bending.  On exam, she had palpable tenderness as well as fixation of pain in the paraspinal area ranging from L3 down to S1 bilaterally.  Slight bending and holding that position greatly accentuated her low back discomfort.  Dr. Rust did not appreciate any significant weakness.  He further indicated that he could not guarantee any benefit through a lumbar surgery, which was perhaps a good thing given her financial difficulties.  (Tr. at 652.)  He did indicate that a facet injection may improve her pain; she wanted to go ahead with this.  (Tr. at 652.)

On October 2, 2013, plaintiff saw Dr. Mark Gibson complaining of ankle pain.  (Tr. at 735.)  She walked into the exam room with no hesitancy, including movement up onto the exam table.  She had mild tenderness in the calf and central ankle without swelling.  She was to use Aleve and Vicodin as needed.  (Tr. at 736.)  An x-ray of the ankle showed degenerative changes but no acute findings.  (Tr. at 751.)  Further testing showed no evidence of deep venous thrombosis.  (Tr. at 774.)

In June 2014, plaintiff underwent another lumbar MRI, which showed the same disc protrusion at the L4-5 level, unchanged from the April 2013 scan, as well as disc bulging

without herniation at the T11-12 level.  The remainder of the study was unremarkable.  (Tr. at 748.)

On August 19, 2014, Dr. Gronau reaffirmed the opinions from her September 2012 questionnaire.  (Tr. at 731-33.)

On September 23, 2014, plaintiff saw Dr. Lyon, complaining of hip pain for the past two weeks.  On exam, she had no significant limp and smooth hip range of motion except at the extremes.  She ambulated with a normal heel-to-toe gait without an assistive device.  She also had good strength and tone throughout the lower extremities.  Dr. Lyon prescribed percocet for pain and a prednisone burst.  If she continued to struggle with pain, they would obtain x-rays and discuss therapy or other modalities.  (Tr. at 778.)

On September 26, 2014, plaintiff returned to Dr. Gronau, complaining of night sweats. She had gained some weight as she was unable to walk as much due to right hip pain.  She had seen orthopedics and started on prednisone and percocet.  She did not like the percocet, as it caused constipation.  The hip was feeling better but then flared up again after vacuuming the previous day.  (Tr. at 776.)  Dr. Gronau suggested plaintiff continue the medications provided by Dr. Lyon but cut the percocet in half and rest the hip over the weekend to avoid further inflammation and pain.  (Tr. at 777.)

An October 1, 2014, left hip x-ray showed standard appearance of the left total hip arthroplasty implant.  (Tr. at 788.) On October 14, 2014, plaintiff underwent a physical therapy evaluation.  (Tr. at 801.)  In her assessment, the therapist noted limited functional mobility and ambulation tolerance due to pain levels, limited hip flexibility, mild decrease in proximal hip strength, and decreased core stability.  She recommended twice weekly sessions for four weeks to include stretching, strengthening, functional based exercises, and lumbar

stabilization.  (Tr. at 804.)

## C.    Administrative Decisions

The agency denied plaintiff's application initially on August 23, 2012 (Tr. at 118, 187), relying on the opinion of consultant Mina Khorshidi, M.D., that plaintiff could perform light work (Tr. at 12-25).  Plaintiff requested reconsideration (Tr. at 197), but the agency denied that request on March 7, 2013 (Tr. at 128, 202), relying on the opinion of consultant Pat Chan, M.D., who also found plaintiff capable of light work (Tr. at 136-37).  Plaintiff requested a hearing before an ALJ (Tr. at 201, 212), but on December 23, 2013, the ALJ issued an unfavorable decision (Tr. at 140-52).  On May 30, 2014, the Appeals Council remanded the case for rehearing and evaluation of the opinions of Drs. Fideler and Gronau.  (Tr. at 158-60; see also Tr. at 425.)

## D.    Hearing

On October 22, 2014, plaintiff appeared with counsel for her hearing on remand.  The ALJ also summoned a vocational expert ("VE").  (Tr. at 45.)

### 1.    Plaintiff

Plaintiff testified that she was 47 years old and lived with her husband.  She stood 5'4" tall and weighed 186 pounds, up about 35 pounds due to being less active.  (Tr. at 50-51.)  She reported past work as a home health aide, restaurant manager, and auto detailer.  Tr. at 54-56.)  She indicated that she last worked in 2009, and that she had not worked since then due to pain and the medications she took.  (Tr. at 53.)  She underwent hip replacement surgery in 2011, which eliminated a little bit of groin pain, but she continued to have other pain, including in her legs, ankle, and back.  (Tr. at 59-62.)  She also reported problems with her hands.  (Tr.

13

at 62-64.)  For pain, she took Vicodin, on average two per day, which took the edge off.  She also sat in a recliner with her feet up on and off throughout the day, in increments of 20-30 minutes, then got up and walked around.  She also used a heating pad.  (Tr. at 65.)

Plaintiff testified that on a good day, she tried to get up and move around more, going for a 10-15 minute walk or spending time outside if the weather was good, interspersed with time in her chair.  (Tr. at 65-66.)  On a bad day, she spent 75-80% of the day in her chair with a heating pad.  She reported four or five bad days per week, more in the winter.  (Tr. at 66.)  In an eight hour day, on a good day, she spent four hours in her recliner; on a bad day, six to seven hours.  (Tr. at 71.)  She indicated that she could walk for 15-20 minutes on a good day, and sit for 45 minutes to an hour before she had to get up and walk around.  (Tr. at 66.)  She reported hobbies of playing games on her iPhone and iPad.  She cooked very little, making simple meals.  She cleaned a "little bit."  (Tr. at 68.)

### 2.    VE

The VE classified plaintiff's past work as an auto detailer as medium work, SVP 2; home health aide as medium, SVP 4; and fast food manager as light, SVP 5.[11]  (Tr. at 75-76.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, capable of light work; allowed to alternate between sitting and standing at will, though not causing her to be off task at the assigned work station in excess of 10% of the

---

[11]Specific Vocational Preparation ("SVP") is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  Jobs with an SVP of 1 may be learned with short demonstration only; 2 – anything beyond short demonstration up to and including one month; 3 – over one month up to and including three months; 4 – over three months up to and including six months; and 5 – over six months up to and including one year. http://www.occupationalinfo.org/appendxc_1.html#II.

14

workday; precluded from climbing ropes, ladders, and scaffolding, kneeling, and crawling; occasionally climbing ramps and stairs, stooping, crouching, and balancing; and not requiring more than occasional exposure to vibration and unprotected heights. (Tr. at 76.) The VE testified such a person could not perform plaintiff's past work but could do other jobs including officer helper, rental/counter clerk, and machine tender. (Tr. at 77-78.) Limiting the person to tasks that required no more than a reasoning development level of 3 in the Dictionary of Occupational Title's GED scale, due to pain and its effect on concentration and attention, these other jobs could still be done.[12] (Tr. at 78.) If limited to sedentary work, the person could work as an office helper, machine tender, and order clerk. (Tr. at 78-79.) The VE testified that the average person is off-task 10% of the time or 6 minutes per hour; if off-task an additional 3 minutes per hour, the person would fall behind in production. (Tr. at 79-80.) A person can be absent from work one to two times per month, but not every single month. (Tr. at 80.)

**E.    ALJ's Decision**

On November 14, 2014, the ALJ issued an unfavorable decision. (Tr. at 27.) Following the required five-step process,[13] the ALJ determined at step one that plaintiff had not engaged

---

[12]General Educational Development ("GED") embraces those aspects of education required of the worker for satisfactory job performance. The GED scale is composed of three divisions – reasoning development, mathematical development, and language development – and ranges from level 1 to level 6. At reasoning level 3, the person must apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form; and deal with problems involving several concrete variables in or from standardized situations. http://www.occupationalinfo.org/appendxc_1.html#II.

[13]Under this test, the ALJ determines: (1) whether the claimant is doing substantial gainful activity; (2) if not, whether the claimant has a severe medically determinable physical or mental impairment; (3) if so, whether the claimant's impairment meets or equals one of the presumptively disabling conditions listed in the regulations; (4) if not, whether the claimant can, based on her residual functional capacity ("RFC"), still do her past relevant work; and (5), if not, whether she can, given her RFC, age, education, and work experience, make an adjustment

in substantial gainful activity since November 7, 2011, the alleged onset date, and at step two that she suffered from the severe impairments of degenerative disc disease of the lumbar spine and degenerative joint disease, status post left hip replacement. (Tr. at 33.) At step three, the ALJ determined that none of these impairments satisfied a Listing. (Tr. at 33.)

Prior to step four, the ALJ determined that plaintiff retained the RFC to perform a range of sedentary work. She could lift and carry 10 pounds occasionally and less than 10 pounds frequently; and stand and walk about four hours collectively and sit about six hours, so long as she was able to alternate between sitting and standing at will though not causing her to be off task at the assigned work station in excess of 10% of the work day in addition to regular breaks. (Tr. at 33.) She could not climb ropes, ladders, and scaffolding, or kneel and crawl. (Tr. at 33-34.) She could occasionally climb ramps and stairs, stoop, crouch, and balance. She was further limited to only occasional exposure to vibration and unprotected heights. Finally, she was limited to tasks requiring no more than a reasoning development level of 3 due to pain and its effects on her concentration and attention. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 34.)

The ALJ noted that plaintiff alleged disability due to depression, anxiety, back pain, hip pain, and leg pain, asserting that these impairments caused significant limitations in her ability to perform work-related activities and to function appropriately in a routine work setting. The ALJ stated: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence

---

to other work. 20 C.F.R. § 404.1520(a)(4).

and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 34.)

The ALJ first reviewed the medical evidence, noting that in January 2010 plaintiff was evaluated by Dr. Rust, a neurosurgeon. Plaintiff reported a long history of pain in her left hip, groin, knee, and back. She indicated that she was pursuing disability as she was no longer able to work as a car detailer. She reported previously having undergone extensive physical therapy. She appeared in no acute distress and demonstrated full strength. Although she had mild restriction and discomfort in her left hip and mild tenderness in her back, straight leg raising was negative and she walked with a normal gait. Dr. Rust found that no immediate surgical intervention was warranted. (Tr. at 34.) In January 2011, plaintiff established care with Dr. Gronau, reporting worsening back pain over the past year, for which she took Vicodin as needed. Plaintiff saw Dr. Rust again in March 2012, having undergone left hip replacement surgery in November 2011 with great resolution of her left hip pain, but reporting ongoing low back pain. Dr. Rust again advised conservative treatment rather than surgery. In June 2012, plaintiff saw Dr. Berquist for a rheumatology evaluation due to widespread body pain. Physical exam demonstrated 0 of 18 fibromyalgia pressure points, and Dr. Berquist diagnosed plaintiff with polyarthralgia. On February 8, 2013, plaintiff underwent a left knee scope, and during a follow-up on February 22, 2013, was doing well, reporting that her pain was improving, her swelling going down, and her motion improving. On April 28, 2013, Dr. Lyon performed an arthroscopy of plaintiff's left knee without complication. When seen in October 2013 for ankle pain, plaintiff reported chronic back pain for which she sometimes needed to take Vicodin. In September 2014, plaintiff was seen for hip pain. On exam, she had no significant limp, walked with normal heel-to-toe gait without any assistive devices, had smooth hip range of motion

17

except at the extremes, and good strength and tone throughout the lower extremities. Imaging revealed a standard appearance of a left total hip arthroplasty implant. Plaintiff was prescribed Percocet and a prednisone burst. (Tr. at 35.)

After this summary of the medical evidence, the ALJ stated:

> The claimant suggests that her hip pain, back pain, knee pain, and ankle pain prevent her from working and significantly limit her ability to perform activities of daily living. However, these subjective complaints are not consistent with the medical evidence of record, which established significant limitations, but none that would preclude the range of sedentary work activities assessed above.

(Tr. at 35.)

The ALJ stated that plaintiff's allegations were also inconsistent with the non-medical evidence. In function reports, plaintiff indicated that she could care for her personal hygiene, prepare simple meals, go outside daily, shop, handle her finances, drive, and perform some household chores such as laundry and dishes. At the hearing, she testified that she liked to use her iPhone and iPad to play games, and that she is able to watch television, cook, clean, shop, and drive. The ALJ concluded: "These activities are not consistent with the alleged impact of her impairments." (Tr. at 35.) Further, "her ability to perform these activities reflects that the limiting effects of her impairments do not preclude her from working at the limited range of sedentary work assessed above." (Tr. at 35-36.)

As for the opinion evidence, the ALJ noted that Dr. Fideler completed a medical source statement in April 2011, indicating that plaintiff was limited to sedentary exertion, would be off task approximately 20% of the workday, and would miss more than four days of work per month due to her impairments. The ALJ gave "this assessment little weight, as it was completed well before the claimant's alleged onset date, when she had her left hip surgery and is inconsistent with more recent records reflecting the claimant walking normally, without

18

assistive devices, and unchanged alignment of her hip." (Tr. at 36.)

Dr. Gronau completed a report in September 2012, which she re-affirmed in August 2014, indicating that plaintiff could only sit and stand for a total of four hours out of an eight-hour workday and would be absent one to two days per month due to her impairments or treatment. The ALJ gave "this assessment little weight as objective findings from September 2014 reflect the claimant functioning somewhere between light and sedentary based on discomfort with walking, with the physical findings on exam being normal except at extremes." (Tr. at 36.)

The ALJ gave "some weight" to the opinions of the agency medical consultants, who concluded that plaintiff remained capable of light work. "Subsequent evidence along with hearing testimony from the claimant, demonstrate that the claimant is more limited than this assessment indicates." (Tr. at 36.)

The ALJ concluded that the medical and non-medical evidence established that plaintiff was limited, but not to the degree alleged, and her impairments and symptoms did not preclude her from the RFC assessed. The ALJ noted that at the hearing plaintiff alleged upper extremity limitations, but the medical records made little to no mention of this condition or complaint. Accordingly, the ALJ included no upper extremity limitations in the RFC. (Tr. at 35.)

At step four, the ALJ determined that plaintiff could not perform her past relevant work as an auto detailer, home health aide, and fast food manager. (Tr. at 37.) At step five, however, the ALJ determined that plaintiff could perform other jobs, as identified by the VE, including office helper, machine tender, and order clerk. The ALJ accordingly found her not

disabled.  (Tr. at 38.)[14]

Plaintiff again sought review by the Appeal Council (Tr. at 442), but on April 20, 2016, the Council denied her request (Tr. at 1).  This action followed.

## II.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the opinions of Drs. Fideler and Gronau, failed to properly weigh plaintiff's statements about the effects of her symptoms, and did not rely on a fully informed VE and a substantially supported RFC.  I address each argument in turn.

## A.    Treating Source Reports

A treating doctor's opinion regarding the nature and severity of a medical condition is entitled to "controlling weight" if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  Brown v. Colvin, 845 F.3d 247, 2016 U.S. App. LEXIS 13254, at *9 (7th Cir. 2016).  An ALJ who does not credit such an opinion must offer "good reasons" for doing so.  Stage v. Colvin, 812 F.3d 1121, 1126 (7th Cir. 2016).  If the ALJ decides that a treating source opinion does not meet the test for controlling weight, he may not simply to discard it; rather, the ALJ must decide how much weight the opinion does deserve, considering the length, nature and extent of the treatment relationship; the supportability of the opinion by the relevant evidence; the consistency of the opinion with the record as a whole; and whether the treating physician is a specialist in the relevant area.  Scrogham v. Colvin, 765 F.3d 685, 697 (7th Cir. 2014).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for

---

[14]On March 9, 2015, after the ALJ issued his decision, plaintiff underwent right hip replacement surgery.  (Tr. at 9-10.)

controlling weight." SSR 96-2p, 1996 SSR LEXIS 9, at *9-10.

In the present case, plaintiff submitted opinions from Dr. Fideler and Dr. Gronau supporting limitations that would preclude work. (See Tr. at 79-80.) The ALJ discounted Dr. Fideler's opinion because it was completed "well before" plaintiff's alleged onset date (when she had her left hip surgery) and was "inconsistent with more recent records reflecting [plaintiff] walking normally, without assistive devices, and with unchanged alignment of her hip." (Tr. at 36.) While Dr. Fideler's report did predate the alleged onset date (by about six months),[15] the ALJ failed to cite post-onset medical evidence reflecting improvement of the degenerative disc disease and spinal stenosis upon which Dr. Fideler based his opinion. Instead, the ALJ focused on plaintiff's hip replacement; the medical evidence shows that while this surgery helped with plaintiff's hip pain, her back pain persisted. (Tr. at 519, 534-35, 652.) The later evidence showing that, after she recovered from her hip surgery, plaintiff ambulated normally and without a cane may provide a basis for discounting Dr. Fideler's notation of "abnormal gait" and his opinion that plaintiff needed an assistive device for standing/walking. But this evidence does not address Dr. Fideler's other opinions based on back pain and medication side effects. See SSR 96-2p, 1996 SSR LEXIS 9, at *5-6 (noting that a treating source report may provide opinions about several issues, which the ALJ may have to evaluate separately).[16]

---

[15]See Beth v. Astrue, 494 F. Supp. 2d 979, 1006-07 (E.D. Wis. 2007) (noting that ALJs should not ignore medical reports simply because they predate the alleged onset of disability, and that evidence from a prior application, even if not re-opened, can be relevant to a claim of disability with a later onset date).

[16]The Commissioner contends that the ALJ would have erred in giving Dr. Fideler's report controlling or great weight because it came from a period when plaintiff had already been adjudicated not disabled. As plaintiff notes, the ALJ did not address the issue of the prior claim, making the Commissioner's argument impermissibly post-hoc. See Pierce v. Colvin, 739 F.3d 1046, 1050 (7th Cir. 2014). Plaintiff further notes that the record does not contain the

The ALJ discounted Dr. Gronau's reports based on "objective findings" from September 2014 showing plaintiff "functioning somewhere between light and sedentary based on discomfort with walking, with the physical findings on exam being normal except at extremes." (Tr. at 36.) The ALJ provided no record cite in support of this statement, but it appears he was referring to plaintiff's September 23, 2014, visit with Dr. Lyon, at which she complained of hip pain for the past two weeks. (See Tr. at 35, citing Tr. at 778.) On exam, she had no significant limp and smooth hip range of motion except at the extremes. Nevertheless, it appears that Dr. Lyon did not doubt plaintiff's pain allegations, as he prescribed percocet and a prednisone burst to "get it calmed down." (Tr. at 778.) On September 26, 2014, plaintiff saw Dr. Gronau, indicating that she was unable to walk as much due to right hip pain. (Tr. at 776.) The ALJ failed to explain how the September 2014 notes undercut Dr. Gronau's opinions regarding plaintiff's capacity over an eight hour workday or anticipated work absences per month. Nor did the ALJ address the physical therapy evaluation completed in October 2014, which contains "objective" findings of decreased strength, mobility, and flexibility. (Tr. at 803-04.) An ALJ may not reject the opinion of a treating doctor by substituting his own medical judgment or by cherry-picking evidence supporting his finding while ignoring contradictory information. See, e.g., O'Connor-Spinner v. Colvin, 832 F.3d 690, 697 (7th Cir. 2016).

The Commissioner responds that the reports from Drs. Fideler and Gronau conflict with each other in several respects, that portions of Dr. Gronau's opinion are consistent with the

previous October 28, 2011 decision and the materials upon which it was based. See HALLEX I-2-6-58 ("If there was a prior ALJ decision, the ALJ must associate the prior ALJ decision with the current claim(s) file."). https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-58.html. Plaintiff contends that her re-application, including Dr. Fideler's report, could be considered an implied request for re-opening. See https://www.ssa.gov/OP_Home/hallex/I-02/I-2-9-1.html. These issues can be addressed on remand.

ALJ's RFC, and that other medical evidence contradicts those portions of Dr. Gronau's report the ALJ did not accept. These arguments are post-hoc; I may not rely on them under the Seventh Circuit's <u>Chenery</u> doctrine. <u>See, e.g.</u>, <u>Meuser v. Colvin</u>, 838 F.3d 905, 911 (7th Cir. 2016). The Commissioner also argues that the ALJ reasonably gave greater weight to the agency consultants. However, as the ALJ himself recognized, the consultants saw just a portion of the record, and the subsequent evidence showed that plaintiff was more limited than their assessment indicates. (Tr. at 36.) Under these circumstances, it is hard to see how the consultants' opinions could suffice to reject the treating source reports. <u>See</u> <u>Childress v. Colvin</u>, 845 F.3d 789, 2017 U.S. App. LEXIS 141, at *8 (7th Cir. 2017). The matter must be remanded for reconsideration of these reports.

## B.      Plaintiff's Statements

In evaluating a claimant's statements regarding pain and other symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce her symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5; SSR 96-7p, 1996 SSR LEXIS 4, at *5. If the claimant has such an impairment, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 16-3p, at *9; SSR 96-7p, at *5-6. At this second step, "the absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts." <u>Ghiselli v. Colvin</u>, 837 F.3d 771, 777 (7th Cir. 2016). Rather, once the claimant has demonstrated the existence of an impairment that can reasonably be expected to produce the symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms based on the entire record, considering the claimant's daily activities; the location, duration, frequency, and intensity of the

23

symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; other treatment or measures the claimant receives or uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. SSR 16-3p, at *18-19; SSR 96-7p, at *8.

As plaintiff notes, in 2016, the Commissioner updated her Ruling on symptom evaluation. The new Ruling eliminates use of the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1.[17] Plaintiff contends that, because "credibility" is no longer the standard, the Seventh Circuit's highly deferential standard of review, under which an ALJ's determination would be overturned only if it was "patently wrong," see, e.g., Stepp v. Colvin, 795 F.3d 711, 720 (7th Cir. 2015), no longer applies.

The Seventh Circuit has not indicated that the new Ruling requires a change in the

---

[17]The Ruling goes on to state:

> Our adjudicators must base their findings solely on the evidence in the case record, including any testimony from the individual or other witnesses at a hearing before an administrative law judge or hearing officer. . . . Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

Id. at *26-27

standard of review, and it has continued to use the "patently wrong" formulation.  See, e.g.,

Hughes v. Colvin, No. 16-1968, 2016 U.S. App. LEXIS 22196, at *14 (7th Cir. Dec. 14, 2016);

Ghiselli, 837 F.3d at 779.  In what appears to be the Seventh Circuit's only discussion of the

new Ruling, the court said: "The change in wording is meant to clarify that administrative law

judges aren't in the business of impeaching claimants' character; obviously administrative law

judges will continue to assess the credibility of pain assertions by applicants, especially as such

assertions often cannot be either credited or rejected on the basis of medical evidence."  Cole

v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016).

In any event, it has long been the rule in this circuit that when a credibility finding rests

on objective factors or fundamental implausibilities, rather than on the claimant's demeanor or

other subjective factors, the court has greater leeway to evaluate the ALJ's determination.  E.g.,

Bates v. Colvin, 736 F.3d 1093, 1098 (7th Cir. 2013).  Further, when the reasons provided by

the ALJ are either improperly analyzed or unsupported by substantial evidence, the

determination will be considered patently wrong.  Ghiselli, 837 F.3d at 778-79; see also Allord

v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006) ("[O]rdinarily a trier of fact's credibility finding is

binding on an appellate tribunal.  But not if the finding is based on errors of fact or logic."); Cruz

v. Astrue, 746 F. Supp. 2d 978, 989 (N.D. Ind. 2010) (remanding where the ALJ's credibility

determination was conclusory and insufficiently explained).

In the present case, the ALJ stated: "After careful consideration of the evidence, the

undersigned finds that the claimant's medically determinable impairments could reasonably be

expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not entirely credible for the

reasons explained in this decision."  (Tr. at 34.)  The ALJ provided two reasons in support of

25

that conclusion.  Neither withstand scrutiny.

First, the ALJ found plaintiff's subjective complaints inconsistent with the medical evidence, which established significant limitations, but none that would preclude the range of sedentary work set forth in the RFC.  (Tr. at 35.)  While the ALJ preceded this statement with a summary of some of the medical evidence, he did not link that discussion to plaintiff's specific claims.  Further, it appears that the ALJ matched plaintiff's statements against the RFC, rather than evaluating the credibility of plaintiff's allegations as an initial matter in order to come to a decision on the merits.  See Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003) (explaining that this sort of analysis turns the process on its head).  Finally, as indicated above, a claimant's statements cannot be rejected just because they lack objective medical support.[18]

Second, the ALJ found plaintiff's daily activities inconsistent with the alleged impact of her impairments, and that her ability to perform these activities showed that the limiting effects of her impairments did not preclude her from working at the limited range of sedentary work set forth in the RFC.  (Tr. at 35-36.)  Again, the ALJ did not link any of those activities to plaintiff's specific claims.  See Brown v. Colvin, No. 13-C-262, 2013 U.S. Dist. LEXIS 144740, at *22 (E.D. Wis. Oct. 7, 2013) ("[T]he ALJ must explain why particular activities undercut the claimant's credibility; it is not enough to simply list various chores, declare them 'significant,' and then find the claimant incredible.").  Nor were the activities the ALJ listed – caring for personal hygiene, preparing simple meals, performing some household chores such as laundry and dishes, using an iPhone and iPad to play games – significant in terms of their demands.

_____

[18]Plaintiff contends that the ALJ overlooked her September 2013 elbow surgery and consequently failed to properly evaluate hand and arm limitations.  It appears that this surgery occurred in 2003, not 2013.  (Tr. at 714-15.)  Like the ALJ, I did not find medical evidence documenting upper extremity problems during the relevant period.  (Tr. at 36.)

See, e.g., Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain."); Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (finding that "minimal daily activities" such as cooking simple meals, vacuuming, grocery shopping three times a month, walking for exercise, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"). Finally, the ALJ did not appreciate the critical differences between such activities of daily living and the demands of a full-time job. Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012).

Additionally, the ALJ failed to consider several important regulatory factors, including the side effects of plaintiff's narcotic pain medication; other measures she used to relieve pain, such as sitting in a recliner with her feet up; and the combined effect of plaintiff's obesity on her ability to function. See SSR 02-01p, 2002 SSR LEXIS 1, at *17 ("The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."). Consideration of these factors could impact the RFC determination.

The Commissioner contends that the ALJ gave due consideration to plaintiff's testimony by finding, unlike the agency consultants, that she could perform sedentary but not light work. RFC is an application of a legal standard to medical facts concerning the claimant's capacity; it is not a substitute for a proper credibility finding. See Peterson v. Chater, 96 F.3d 1015, 1016 (7th Cir. 1996). The Commissioner also attempts to fill in some of the gaps in the ALJ's analysis by, for instance, citing activities that undercut plaintiff's claim that she cannot stand or walk for

more than 10 to 15 minutes at a time.  I cannot consider such arguments.  See, e.g., Steele

v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).    The matter must be remanded for

reconsideration of plaintiff's statements regarding her symptoms and their impact on her ability

to work.

## C.    VE/RFC

"In this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment

must incorporate all of the claimant's limitations supported by the medical record." Varga v.

Colvin, 794 F.3d 809, 813 (7th Cir. 2015) (internal quote marks omitted).  The RFC assessment

must also include a narrative discussion describing how the evidence supports each

conclusion.  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005) (citing SSR 96-8p).

Plaintiff alleges that the ALJ's errors, discussed above, resulted in the omission of

various limitations from the RFC and the hypothetical question to the VE upon which the ALJ

based his step five finding.  On remand, the ALJ, after reconsidering the medical opinion

evidence and plaintiff's statements, will need to reconfigure RFC accordingly.

Plaintiff further argues that the ALJ failed to explain several aspects of the RFC, such

as the off task figure of 10% of the day, which happens to match the VE's estimate of employer

tolerance (Tr. at 79-80); the reasoning development level of 3; and the limitation to "occasional"

climbing and exposure to vibration and heights.  See Rapp v. Colvin, No. 12-cv-353, 2015 U.S.

Dist. LEXIS 34106, at *13 (W.D. Wis. Mar. 19, 2015) (remanding where the ALJ failed to

explain how he came up with his percentages); accord Finzel v. Colvin, No. 15-C-98, 2015,

2015 U.S. Dist. LEXIS 107184, at *16 (E.D. Wis. Aug. 14, 2015).  The Commissioner counters

that plaintiff's doctors also failed to explain how they arrived at the percentages in their reports.

However, it is the ALJ's job to provide a bridge from the evidence to his conclusion; to the

extent that a doctor fails to explain the basis for her opinion the ALJ may seek clarification. See Gipson v. Colvin, No. 16-C-865, 2017 U.S. Dist. LEXIS 4779, at *12-13 (E.D. Wis. Jan. 12, 2017) (citing Beardsley v. Colvin, 758 F.3d 834, 840 (7th Cir. 2014); Barnett v. Barnhart, 381 F.3d 664, 669 (7th Cir. 2004)).  On remand, the ALJ should offer an explanation for these conclusions and how they account for plaintiff's limitations, including the impact of pain and medication side effects on plaintiff's ability to maintain concentration and attention.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 21st day of February, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge